CONNOR, J., concurring arguendo; WALKER, J., concurring in concurring opinion. BROWN, J., dissenting arguendo.
The plaintiff sued to recover damages of defendant for the negligent killing of his intestate, who was an employee of defendant in the capacity of tool carrier in its machine shops at Spencer, N.C. Said intestate was a boy about 16 years old, and worked for defendant, at night, in the capacity aforementioned. Defendant's shops and about forty tracks are between the two towns — Spencer and East Spencer — and several thousand people live on each side of these tracks, and about (456) 1,300 people work for defendant in its shops and on its yards. It was the custom for the people (with the knowledge and by permission of defendant) working for the defendant, and those living in said towns, to pass over these tracks at their pleasure and in the performance of their duties. Defendant provided two walkways, or crossings, over its tracks for said persons to cross, and for the past ten years permitted people to cross thereover in large numbers — several hundred per day; and when these crossings or openings were closed or blockaded by trains or cars, defendant permitted them to cross said tracks by climbing over, under, or between cars, and this has been the custom since the shops were built, in 1896. Said intestate lived in East Spencer, and his usual and customary way home, together with all persons living in East Spencer, was to cross over these tracks. The night employees got off duty about 7 o'clock a. m., and if the tracks were blockaded with cars and the crossings were blockaded, intestate and others went to their homes by passing between, over, and under cars across said openings or crossings. The morning in question, when said intestate was injured, a string of cars was standing on one of these tracks, known as the "lead track," and had been standing there for several hours, and to this string of cars other cars were attached by a chain, which left a space of several feet. The first car which was chained to the string of cars was one over one of said crossings, which made it necessary for the intestate — carrying out the usual custom — to pass under, between, or over it, in order to go his usual way home. This string of cars did not have any engine attached to it, as it was *Page 333 
standing still, and there was no watchman or sentinel at said crossing, or at any place on said cars or near there, to give warning or notice of the cars being put in motion; and as said intestate was attempting to pass between the two cars that were chained together, without warning or signal, defendant caused one of its engines to be suddenly and violently shoved back against said cars and intestate to be caught between them and injured and mashed, from which injuries he (457) died. The car that was chained to the string of cars had no bumper or drawhead, so that when the string of cars was shoved back against it there was no space left between said cars where intestate was attempting to pass through.
At the close of the evidence the motion of defendant to dismiss was granted, and the plaintiff appealed.
The plaintiff was entitled to have this cause submitted to a jury.
There are thirty to forty tracks in Spencer, which are almost continuously filled with cars, more or less. The railroad company has 1,300 operatives working in its shops and yards and living on both sides of the railroad, many of whom have to cross these tracks daily in going from their homes to their work, and returning. The defendant's operatives and their families and attendant population constitute several thousand people. These operatives and people, or many of them, have to cross these tracks, necessarily, very often. The witnesses, whose evidence must be taken as true in this motion, says that several hundred people cross these tracks daily, and for ten years the custom has always been go to through, under, or between the cars, or over them, whenever the tracks are blocked. The defendant, knowing this fact, was guilty of gross negligence, in that it did not provide either a subway or overhead bridges, or, at least, lifting bars, with a guard at each passway. The latter course was ordered (Brown,J., in Hickory v. R. R., 143 N.C. 451) where there was only one track. Here there are forty. This is a necessary precaution, and, no precaution of any kind being provided, accidents such as this must necessarily occur.
It was also negligence, as this Court has over and again (458) declared, to attach the engine to this dead string of cars and suddenly run them backwards, without warning or signal or any one on the rear of the train to give notice. Ray v. R. R., 141 N.C. 84;Hudson v. R. R., 142 N.C. 202. There being no bumper or drawhead, when the plaintiff's intestate was caught between the cars by the sudden pushing back of the dead string of cars, he could not possibly escape. *Page 334 
This being a nonsuit, it is not necessary to set out all the testimony, but only so much as will show, "with the most favorable inferences which a jury would be authorized to draw from it," that there was enough evidence to entitle the plaintiff to his constitutional privilege of a trial by jury. The following are verbatim extracts from the testimony:
The plaintiff testified, in part: "There are two towns at Spencer — one on the east and one on the west side of the railroad tracks — and the shops are between the two towns. I worked at the shops. About 1,300 people are employed there. I guess 400 or 500 of the employees live on the east side of the railroad tracks; about 800 live on the west side. The population of East Spencer is about 5,000. The custom of those who live on the east side of the railroad, in going to the shops, is to cross the tracks to get to the shops to work. There are between thirty and forty tracks there. I have seen people going to and coming from their work across these tracks in great numbers. I know about where Grubb was injured. There is an opening leading from the carpenters' shop as far as the shed goes. There is a plank walkway that leads to the carpenters' shop; it is used by people to walk across and to roll hand cars across the tracks. The opening runs north and south. If cars are on the tracks across this opening, people have to climb over, or under, or through, or go around the cars."
Lee Ketchie testified, in part: "I lived on the east side of the railroad during the three years and eleven months preceding 25 November, 1905. I had to cross the lower end of freight yard, and also (459) the shop yard, in order to get to my work. I know what the custom of the defendant's employees in going to and from their work was. This custom had existed ever since the shops were built, in the spring of 1896. The custom was to cross the freight yard and to go through, under, or between the cars or over the top of them. As a general thing, people going from East to West Spencer go across the yard. This custom has prevailed since the shops were built. Several hundred people went backward and forward daily at the time the intestate was hurt, and before. The defendant's employees have to cross through, between the cars, or over them, to get to their work. My duties often required me to work in the yard; others were required to work in the yard. We had to go from the carpenter shop to the yard, down through the opening to the carpenter shop. There was another opening south of the opening to the carpenter shop; it led from the car shops across the other tracks. The tracks of the opening are laid the same distance apart as the railroad tracks. Both of these openings run east and west, through the sheds. The railroad tracks cross these openings and run north and south. When the openings are filled with *Page 335 
cars or trains, the workmen go to their work by crossing under the cars or going over or between them. This is so, to a great extent. The crossings are constantly blocked. mornings and evenings and several times a day. They were usually blocked in the mornings, when we went to work. They were frequently blocked about quitting time in the afternoon. The men, to get to their homes, had to cross the line of cars or go a considerable distance around them. Those who went home to dinner had to cross these tracks and go out across the freight yard. People could not have gone around and gotten their dinners and gotten back in time to work. I have seen the foremen crawl through cars, and under cars, numbers of times. On 25 November, 1905, I was at the shops, right near where the intestate was injured. It would not exceed 50 or 60 feet from where I was to where the intestate was injured. He was between two of the cars standing on the shop lead (460) track; he was going toward East Spencer — east from the carpenter shop. The intestate was injured on track No. 8, called the shop lead track. Before the he started to cross, going east, there was astring of cars on this track; they were there that morning as I went towork at 7 o'clock. He was injured just a little after 8 o'clock. Between 7o'clock and the time the intestate was injured, the cars stood still. Ifthere was an engine to the cars I did not see it. An engine was finallyattached to the north end of the string of cars. The string of cars stood across the opening; about four of the cars were south of the opening. The opening was shut up and impassable, unless you went between the cars or under them. The middle of the car was on the crossing (opening); cars were attached to each end of that car. The intestate was caught between the cars about one-half car-length north of the opening. I suppose he went to the nearest place to go between the cars. The place where he was caught was 15 or 20 feet from the crossing (opening). I saw where the cars were when the engine was attached to them. I was on track No. 9, two car-lengths from where Grubb was hurt; it was about 60 feet from where he was hurt. I was about 40 feet nearer the engine than he was. I could not see the enginewhen it was attached to the cars. It was down in the lower (north) part of the yard, around a curve. The tracks east of the lead track, which run into the lead track, were filled with cars; they went out to within a short distance of the lead track. They could not see the engine from their side. It was impossible for Grubb to see the engine from where he stood. I saw the cars he was caught between; one of them had the drawhead out and they were chained together. The one farthest north had the drawhead and bumpers out. It was chained to car behind it. There were between2 and 3 feet between the cars as they were chained together.The cars came together when the engine pushed cars back. (461) *Page 336 
Grubb was between two cars, passing over, and was caught. The cars could not have come together if the car had had a drawhead. They would have been about 2 feet apart. There was no flagman on the rear of the train beforethe cars were shoved back together. There was no flagman or sentinel on theground to give signals. There was no watchman or sentinel at either ofthese openings or crossings. No signal was given, that I heard. If the bellof the engine had been ringing as it was attached to the cars, it couldhave been heard where Grubb was."
As this witness stated that this "string of cars" had been on the track since 7 o'clock; that "if there was an engine to the cars I did not see it"; and, further, "An engine was finally attached to the north end of the string of cars"; that "I (witness) was about 40 feet nearer the engine than he (the deceased) was"; that "I could not see the engine when it was attached to the cars," it is an inference the jury might have reasonably drawn (and is, therefore, to be considered on a nonsuit) that this string of cars, which had been standing on the track since 7 o'clock, and to which he did not see any engine, was a dead string of cars, and that the sudden attachment of the engine and its being run back, without notice or signal, was the causa causans of the death of plaintiff's intestate.
The plaintiff's intestate was a boy, working on the night shift in the defendant's shops on the west side of these forty tracks. His tour of work ended at 7 a. m. He then had to return over these numerous tracks, as he lived on the east side. He had to wash up, and possibly may have remained to breakfast or for other purposes, so that it was after 8 o'clock when he started home across these tracks, as he and others residing on the east side were accustomed to do. There is no evidence that this delay made it any more dangerous than if he had crossed sooner after 7 o'clock. He found a string of "dead" cars (462) standing still on one of the tracks, the rear car of which was exactly across his usual road home. Between the end of this car and a disabled car, attached to the rear car by a chain, there was an interval of several feet. The intestate attempted to pass through this interval. He thus went probably a third of one car's length out of the direct road (one witness says 15 feet) to clear the car standing in the road. The string of cars was made up of "dead" cars, we take it, with no engine attached. The sudden attachment of the engine, which was done around a curve, so that the intestate did not see it attached, and the pushing back of the cars, without signal or any one on the rear to give notice, it would seem, were the proximate cause, and not the conduct of the boy, who was getting across these numerous tracks in the best way he could, as he and so many others were daily required to do. If there was any contributory negligence, whether that *Page 337 
or the negligence of the defendant was the proximate cause of the death of the boy was a matter which should be passed on by the jury, not by the court.
This renders it unnecessary to consider the other exceptions for exclusion of evidence. The judgment dismissing the action is set aside.
New trial.